**SO ORDERED.**

**SIGNED this 23 day of May, 2007.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

| | |
|---|---|
| **IN RE:** | |
| **RUSSELL W. DAVIS, JR.** and **TERESA L. DAVIS,** | **Case No. 05-9919-8-JRL** |
| Debtors. | Chapter 7 |

_____

**MEMO MONEY ORDER COMPANY,**

    Plaintiff,

v.                                                                    Adversary Proceeding No.
                                                                      L-06-00012-8-AP

**RUSSELL W. DAVIS, JR.,
TERESA L. DAVIS,** and
**JOSEPH N. CALLAWAY,** as Bankruptcy
Trustee for Davis' IGA, Inc.,

    Defendants.

_____

## ORDER

The matters before the court are the motions for summary judgment filed by MEMO Money

Order Company ("MEMO"), Russell and Teresa Davis, and Joseph Callaway, as the Chapter 7

trustee of the estate of Davis' IGA, Inc. ("Davis IGA"). On April 16, 2007, the court conducted a hearing on these matters in Raleigh, North Carolina.

## UNDISPUTED FACTS

1. MEMO is a Pennsylvania corporation authorized to do business in the state of North Carolina.

2. Davis IGA is a North Carolina corporation that previously operated a grocery store in Windsor, North Carolina.

3. For all periods relevant to this adversary proceeding, Russell and Teresa Davis each owned a one-half interest in Davis IGA.

4. Mr. Davis was the president of Davis IGA and the sole manager of the grocery store operated by Davis IGA.

5. On January 12, 1995, MEMO entered into a Personal Money Order Trust Agreement ("the Agreement") with Davis IGA.

6. Pursuant to the Agreement, Davis IGA was appointed as a special agent of MEMO to sell MEMO money orders at its grocery store.

7. Paragraph two of the Agreement, entitled "Trust Relationship," states: "Merchant shall receive and hold in trust for MEMO all blank money orders delivered to Merchant by MEMO and all money received by Merchant from the sale of money orders, including without limitation the money order fees established by MEMO from time to time ("trust funds"). Merchant shall hold the trust funds separate and apart from other funds of merchant."

8. Paragraph thirteen of the Agreement states that the Agreement shall be construed in accordance with Pennsylvania law.

2

9. Pursuant to paragraph seven of the Agreement, the Agreement was for a two-year period, and it automatically renewed for successive two-year periods upon expiration.

10. The Agreement was last renewed on January 12, 2005 for an additional two-year period.

11. Davis IGA maintained two business checking accounts, including a General Operating Account and a Money Order Account.

12. In conjunction with the Agreement, on January 12, 1995, Davis IGA executed an Electronic Funds Transfer Service Agreement authorizing MEMO to draw electronic debits from the Money Order Account for payments of all MEMO money orders sold plus the fees for each accounting period.

13. Prior to November 1999, Ms. Davis only worked in the store at odd times when a fill-in cashier was needed.

14. Beginning November 22, 1999, Ms. Davis began full-time employment at Perdue Farms, Inc., and did not work in the grocery store again through its closing in October 2005.

15. After November 22, 1999, Ms. Davis never made a deposit for the grocery store, never wrote a check for the grocery store, and had no knowledge of how the bank accounts were handled other than through her husband who managed the store's accounts.

16. On July 13, 2000, Mr. and Ms. Davis executed a Personal Indemnity and Guaranty in favor of MEMO, which states in pertinent part that the debtors "jointly and severally, absolutely and unconditionally, personally guarantee and become surety for Trustee's full performance of the Agreement, including without limitation the prompt and punctual payment of all amounts becoming due from Trustee to Memo thereunder, and shall indemnify and hold MEMO harmless against any

and all damage, loss expense (including attorney's fees) and/or liability sustained by it by reason of or related to Trustee's failure to perform the Agreement."

17. An on-site computer was installed at Davis IGA's store for issuing money orders to customers.

18. The on-site computer generated a daily sales report of money orders issued at the store as well as a weekly report generated on Sunday nights summarizing the money orders issued for the previous week.

19. MEMO performed a weekly electronic sweep of the Money Order Account on Tuesdays or Wednesdays for the amount listed on the weekly report for the previous week.

20. It was routine business practice for Davis IGA to take money order proceeds and intermingle the funds with the daily grocery store sale receipts by placing all funds in the general cash drawers at the store.

21. It was routine business practice for Davis IGA to deposit money order proceeds and daily grocery store sales receipts together in the General Operating Account and then transfer funds to the Money Order Account for issued money orders and associated fees on the day of MEMO's weekly sweep of the Money Order Account.

22. For the week of September 26, 2005 through October 2, 2005, Davis IGA issued money orders, including fees, totaling $17,390.35.

23. On October 5, 2005, MEMO attempted to electronically sweep the Money Order Account for $17,390.35, but there was insufficient funds in the Money Order Account.

24. For the week of October 3, 2005 through October 10, 2005, Davis IGA issued money orders, including fees, totaling $23,715.03.

25.     On October 13, 2005, MEMO attempted to electronically sweep the Money Order Account for $23,715.03, but there was insufficient funds in the Money Order Account.

26.     Davis IGA closed its store in October 2005.

27.     On October 14, 2005, Mr. and Ms. Davis filed for relief under Chapter 7.

28.     Joseph N. Callaway was appointed as Chapter 7 trustee in Mr. and Mrs. Davis' individual bankruptcy case.

29.     On December 1, 2005, Davis IGA filed for relief under Chapter 7.

30.     Mr. Callaway was appointed as Chapter 7 trustee in the Davis IGA bankruptcy case.

31.     Once appointed as trustee in the Davis IGA case, Mr. Callaway directed the closing of Davis IGA's General Operating Account and Money Order Account.

32.     Mr. Callaway received $30,530.38 from the Operating Account and $39,507.30 from the Money Order Account for a total of $70,037.68.

33.     IGA is indebted to MEMO in the amount of $41,105.38 for failure to remit the funds that IGA held in trust for MEMO for money orders issued during the weeks of September 26, 2005 through October 2, 2005 and October 3, 2005 through October 10, 2005.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure is applicable to adversary proceedings. Fed. R. Bankr. P. 7056. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "When a motion for summary judgment is made and supported . . . , an adverse party may not rest upon the

mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The facts must be viewed in the light most favorable to the non-moving party. Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).

## ANALYSIS

In counts one and two of the amended complaint, MEMO seeks the court to deny Mr. and Ms. Davis' discharge of the claim in the amount of $41,105.38 plus any awarded damages, pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4). In count three of the amended complaint, MEMO seeks the court to order Mr. Callaway, as Chapter 7 trustee in the Davis IGA bankruptcy case, to distribute any seized funds to MEMO from the Money Order Account. In the debtors' answer to the amended complaint, the debtors admit that they executed the Personal Indemnity and Guaranty in conjunction with the Agreement; however, they deny that the debt to MEMO is nondischargeable. The debtors admit that the trustee seized funds from the Davis IGA accounts, including the Money Order Account. In the trustee's answer to the amended complaint, he states that MEMO is not entitled to any seized funds from the Davis IGA accounts because all funds were intermingled with Davis IGA grocery sales proceeds and lost any character as MEMO's property.

MEMO filed a motion seeking the court to enter summary judgment in its favor on all counts of the amended complaint. The debtors filed a motion seeking the court to enter summary judgment in favor of the debtors on the first and second counts of the amended complaint. The trustee filed

a motion seeking summary judgment on Count Three of the amended complaint, asserting that MEMO is not entitled to receive any sums seized by the trustee in the Davis IGA bankruptcy case.

      A.      MEMO's Entitlement to Seized Funds

First, the court addresses whether MEMO is entitled to any funds seized by the trustee from the Money Order Account in the Davis IGA bankruptcy case. Although the Agreement is governed by Pennsylvania law, the money order transactions took place in North Carolina. MEMO asserts that the Money Transmitters Act applies to the subject transactions. N.C. Gen. Stat. §§ 53-208.1-53-208.30. At the hearing, MEMO clarified that it is a "licensee" under the Act. N.C. Gen. Stat. § 53-208.2(9). Neither the trustee nor the debtors disputed the applicability of the Act to the subject Agreement. The Money Transmitters Act governs monetary transmissions in North Carolina. N.C. Gen. Stat. § 53-208.3. The Act is applicable to contracts entered into on or before November 1, 2001. N.C. Gen. Stat. § 53-208.1. While the Agreement was originally executed on January 12, 1995, it automatically renewed every two years for a two-year period. The last renewal occurred January 12, 2005. Accordingly, the Act is applicable to the Agreement between Memo and Davis IGA.

MEMO, as a licensee authorized to do business in North Carolina, delegated authority to Davis IGA to issue money orders at its grocery store in Windsor, North Carolina. Davis IGA was an "authorized delegate" pursuant to its Agreement with MEMO. An "authorized delegate" is "an entity designated by the licensee . . . to sell or issue payment instruments or stored value or engage in the business of transmitting money on behalf of a licensee." N.C. Gen. Stat. § 53-208.2(2). The definition of "payment instrument" includes "money order." N.C. Gen. Stat. § 53-208.2(14). The section of the Act, entitled "Authorized delegate conduct," states that "[a]n authorized delegate shall

7

remit all money owing to the licensee in accordance with the terms of the contract between the licensee and the authorized delegate." N.C. Gen. Stat. § 53-208.20(c). The Agreement required Davis IGA to hold the funds received from the issuance of money orders "separate and apart" from other funds. While the evidence presented on summary judgment undisputedly supports that Davis IGA commingled its grocery store sales proceeds with the proceeds from the issuance of money orders, that does not preclude MEMO's entitlement to commingled funds as asserted by the trustee. The Act states:

> All funds, less fees, received by an authorized delegate of a licensee from the sale or delivery of a payment instrument or store value issued by a licensee or received by an authorized delegate for transmission shall constitute trust funds owned by and belonging to the licensee from the time the funds are received by the authorized delegate until the time when the funds or an equivalent amount are remitted by the authorized delegate to the licensee. <u>If an authorized delegate commingles any funds with any other funds or property owned or controlled by the authorized delegate, all commingled proceeds and other property shall be impressed with a trust in favor of the licensee in an amount equal to the amount of the proceeds due the licensee.</u>

N.C. Gen. Stat. § 53.208.20(f)(emphasis added). Thus, commingled funds are impressed with a trust in favor of the licensee in the amount due the licensee. This statutory trust on commingled funds operates as a safeguard for the licensee where, as here, the authorized delegate fails to segregate money order proceeds pursuant to its agreement.

While there is no case law interpreting the provisions of the Money Transmitters Act, the trust that it imposes on commingled funds is comparable to the statutory trust created by the Perishable Agricultural Commodities Act ("PACA"). 7 U.S.C. § 499(a)-(t). PACA creates a statutory trust for unpaid suppliers and sellers of perishable agricultural commodities. 7 U.S.C. § 499e(c)(2). The commodities and the assets derived from those commodities are held in trust for the benefit of the unpaid suppliers and sellers until they are fully paid. <u>Id.</u> Under PACA, once any trust

assets are commingled with non-trust assets, the buyer of the commodities has the burden of establishing what assets are not subject to the trust. Sanzone-Palmisano Co. v. M. Seaman Enter., Inc., 986 F.2d 1010, 1012-13 (6th Cir. 1993); Tony Vitrano Co. v. Nat'l Produce Co., Inc., 815 F.Supp. 23, 25 (D.D.C. 1993).

Here, once Davis IGA filed for relief under Chapter 7, the trustee closed Davis IGA's bank accounts and seized funds from those accounts, including $30,530.38 from the General Operating Account and $39,507.30 from the Money Order Account. While the evidence reflects that the monies in the Money Order Account were first commingled with funds from grocery store sales in the General Operating Account, the court finds that the Money Transmitters Act imposes a trust on the commingled funds. Therefore, the trustee shall turn over $39,507.30 seized from the Money Order Account.[1] MEMO asserts alternative arguments for the trustee's turnover of funds, pursuant to Pennsylvania trust law and the lowest intermediary balance rule. The court finds it unnecessary to address those alternative arguments given the applicability of the Money Order Transmitters Act to the case at bar.

    B.    Exception from Discharge under § 523(a)(4)

MEMO seeks the court to except MEMO's claim and any applicable damages from the debtors' discharge. While MEMO raises counts for the exception of discharge under both § 523(a)(2)(A) and § 523(a)(4), it exclusively focuses on § 523(a)(4) in its motion for summary

---

[1] It appears that the remainder of the claim could be satisfied by the return of seized funds from the General Operating Account under the Money Transmitters Act since those funds were commingled with proceeds from the issuance of money orders. However, in its amended complaint, MEMO seeks the court to order the trustee to turn over funds from the "trust account." The court, therefore, will not rule on summary judgment beyond the scope of the claims articulated in the amended complaint.

judgment. Section 523(a)(4) states, in pertinent part, that an individual debtor is not discharged from a debt "for fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). Thus, in order to prove that a debt is nondischargeable under § 523(a)(4), "a creditor must prove the debtor committed (1) fraud or defalcation (2) while acting in a fiduciary capacity." Pahlavi v. Ansari (In re Ansari), 113 F.3d 17, 20 (4th Cir. 1997). Defalcation under § 523(a)(4) means "misappropriation of trust funds or money held in any fiduciary capacity; [or the] failure to properly account for such funds." Id. Defalcation, however, "does not have to rise to the level of 'fraud,' 'embezzlement' or even 'misappropriation.'" Id. "[N]egligence or even an innocent mistake which results in misappropriation or failure to account is sufficient." Uwimana v. Uwimana (In re Uwimana), 274 F.3d 806, 811 (4th Cir. 2001). "Fiduciary" under § 523(a)(4) "is limited to instances involving express or technical trusts." In re Harell, 173 F.3d 850, 1999 WL 150278 at *3 (4th Cir. Mar. 19, 1999). "The trustee's obligations must have been imposed prior to, rather than by virtue of, any claimed misappropriation of funds; constructive trusts or trusts ex malificio thus . . . fall short of the requirements of § 523(a)(4)." Id.

  MEMO compares this case to Global Express Money Orders, Inc. v. Davis (In re Davis), 262 B.R. 673 (Bankr. E.D. Va. 2001). In Davis, Davis Investments, LLC ("Davis Investments") entered into an agreement with Global Express Money Orders, Inc. ("Global") to issue money orders as part of its convenient store operations. Id. at 676. The male debtor was the manager, director, president and 90% equity owner of Davis Investments. Id. The female debtor owned the remaining 10% equity in Davis Investments. Id. Davis Investments breached the agreement by failing to segregate money order funds from general operating funds, and it allowed store revenues to be commingled with money order funds. Id. at 678. Davis Investments defaulted on its payments of sums owed to

10

Global for money order sales. Id. The agreement included a personal indemnity and guarantee of payment by the debtors. Id. at 676.

Global sought to except the debt owed for money order sales from the male debtor's discharge pursuant to § 523(a)(4). Id. at 682. The court concluded that the agreement had created an express trust under Maryland law between Davis Investments as trustee and Global as the beneficiary of the trust. Id. at 683. The court found that the male debtor had acted in a fiduciary capacity to Global as the corporate officer charged with maintaining the fiduciary relationship between Davis Investments and Global. Id. at 684. The court determined that the male debtor had committed a defalcation by permitting Davis Investments to commingle trust funds with general operating funds. Id. at 685.

Here, it is undisputed that the Agreement between MEMO and Davis IGA is governed by Pennsylvania law, pursuant to the choice of law provisions in the Agreement. An express trust exists under Pennsylvania law when there is "(a) an express intention to create a trust; (2) an ascertainable res; (3) a sufficiently certain beneficiary; and (4) a trustee who 'owns' and administers the res for the benefit of the beneficiary." In re Verrone, 277 B.R. 66, 72 (Bankr. W.D. Pa. 2002). The Agreement clearly defines a trust relationship between Davis IGA as trustee and MEMO as beneficiary. Under the Agreement, Davis IGA was to "receive and hold in trust for MEMO all blank money orders delivered to [Davis IGA] by MEMO and all money received by [Davis IGA] from the sale of money orders, including without limitation the money order fees established by MEMO from time to time ("trust funds")." The res is the "trust funds" under the Agreement. The Agreement required Davis IGA to hold the trust funds separately from other funds, and this trust relationship was established prior to any alleged wrongdoing. The court concludes that there was an express trust

under Pennsylvania law. MEMO established this point in its memoranda of law accompanying its motion for summary judgment.

  The court finds that Mr. Davis, as the president and major stockholder of Davis IGA and the sole manager of the grocery store, acted in a fiduciary capacity, as he was charged with maintaining the fiduciary relationship between Davis IGA and MEMO. The court finds that Mr. Davis' conduct amounted to defalcation. Mr. Davis managed the accounts of Davis IGA and permitted Davis IGA to commingle the trust funds with the general operating funds of the grocery store. Moreover, he permitted Davis IGA to create a false illusion that trust funds were being segregated from other funds in a Money Order Account when, in actuality, all funds were being held in the General Operating Account until the day of the anticipated weekly sweep of the Money Order Account.

  After the turnover of seized funds from the Money Order Account by the trustee, there still remains $1598.08 of debt owed to MEMO. Mr. Davis is personally liable for the remaining $1598.08 pursuant to the Personal Indemnity and Guaranty and for violation of N.C. Gen. Stat. § 75-1.1. Whether an act or practice amounts to an unfair and deceptive trade practice under Chapter 75 of the North Carolina General Statutes is a question of law. Rawls & Associates v. Hurst, 144 N.C. App. 286, 293, 550 S.E.2d 219, 224 (N.C. Ct. App. 2001). To prove a claim of unfair and deceptive trade practice, the plaintiff must show: "(1) an unfair or deceptive act or practice or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or his business." Norman Owen Trucking, Inc. v. Morkoski, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (N.C. Ct. App. 1998). "Simple breach of contract or failure to pay a debt do not qualify as unfair or deceptive acts, but rather must be characterized by some type of egregious or aggravating circumstances before the statute applies." Id. "A practice is deceptive if it

has the capacity or tendency to deceive; proof of actual deception is not required." Richardson v. Bank of America, N.A., 643 S.E.2d 410, 416 (N.C. Ct. App. 2007).

Here, the court finds that there were aggravating circumstances beyond breach of contract or failure to pay a debt that constituted a deceptive practice by Mr. Davis. The Agreement required that the funds from the issuance of money orders be segregated from other funds. The undisputed evidence is that Mr. Davis, as the president and major stockholder of Davis IGA and the sole manager of the grocery store, managed the business accounts for the grocery store. He allowed for the creation of a "Money Order Account"and signed an Electronic Funds Transfer Service Agreement on behalf of Davis IGA so that MEMO could electronically sweep the Money Order Account for funds in connection with the issuance of money orders and associated fees. The Money Order Account was essentially an illusory account because all of the grocery store sales proceeds and money order proceeds were being commingled in the cash drawers and deposited in the General Operating Account. Only before MEMO's anticipated weekly sweep of the account would money be transferred to the Money Order Account. Beyond commingling of funds, Mr. Davis, as manager of these business accounts and as the fiduciary charged with maintaining the trust relationship between Davis IGA and MEMO, created a false illusion by making it appear as though all money order proceeds were being  directly deposited and segregated in the Money Order Account upon issuance of the money orders. This deceptive act affected commerce, as it involved the sale of money orders. The deceptive act proximately caused actual injury to MEMO, as MEMO was unable to receive all funds due for the sale of money orders and related fees, as those funds were not available in the Money Order Account. MEMO is entitled to $1598.08 against Mr. Davis, pursuant to the Personal Indemnity and Guaranty and N.C. Gen. Stat. § 75.1, representing the remainder of

the funds owed to MEMO after the trustee turns over the seized funds from the Money Order Account. The court trebles the $1598.08, pursuant to N.C. Gen. Stat. § 75-16, for a total of $4794.24.

In its motion for summary judgment, MEMO seeks attorney's fees pursuant to the Agreement. After the summary judgment hearing, MEMO's attorney filed an affidavit in support of an award of attorney's fees showing a total of $21,828.00 expended in this matter. Under paragraph 15 of the Agreement, entitled "Cost of Enforcement," it states that "Merchant shall pay, on demand by MEMO, all costs and expenses including reasonable attorney's fees incurred by MEMO in connection with the enforcement of this Agreement." Because the Agreement does not specify what percentage of the outstanding balance is allowable as reasonable attorney's fees for the enforcement of the Agreement, reasonable attorney's fees is construed to mean 15% of the outstanding balance under the Agreement. N.C. Gen. Stat. § 6-21.2. Mr. Davis is liable for attorney's fees incurred by MEMO as a result of Davis IGA's failure to perform the Agreement, pursuant to the Personal Indemnity and Guaranty. The damages of $4794.24 plus attorney's fees of $6,165.81, representing 15% of the outstanding balance of $41,105.38 due under the Agreement, are excepted from Mr. Davis' discharge pursuant to § 523(a)(4).

Regarding the claim for relief under § 523(a)(4) against Ms. Davis, the debtors point to the case of Lyndon Property Insurance Company v. Adams (In re Adams), 312 B.R. 576 (Bankr. M.D.N.C. 2004). In Adams, the court held that there was no claim for relief shown against the female debtor under §§ 523(a)(2)(A), 523(a)(2)(B), or 523(a)(4). In that case, the court found that the male debtor, who was the managing member, an officer, and an employer of a limited liability company, had knowingly and fraudulently caused materially false financial statements to be sent

on behalf of the limited liability company to an insurance company for the issuance of bonds in connection with a construction project. Id. at 586. Mr. Adams had signed an indemnity agreement in connection with the issuance of the bonds. Id. at 580. The court found that the insurance company's losses resulting from the false financial statements constituted a debt of Mr. Adams that was nondischargeable pursuant to § 523(a)(2)(B). Id. at 587. However, the court found that the situation was "entirely different" regarding the female debtor who had a full-time job elsewhere and was not involved in the daily operations of the limited liability company. Id. at 587. The evidence reflected that the female debtor was not personally involved in obtaining the bonds that were issued by the insurance company or had been involved in any improper conduct with respect to the limited liability company. Id. Unlike this case, however, the female debtor in Adams had not been a shareholder of the company for several years, had never been an employee of the company, and had not signed an indemnity agreement in connection with the issuance of the bonds. Id. at 579-80.

The facts here present a closer case. Ms. Davis is a 50% stockholder in Davis IGA and is personally liable to MEMO pursuant to the Personal Indemnity and Guaranty. It is undisputed, however, that Mr. Davis was the sole manager of the grocery store. Prior to November 1999, Ms. Davis only worked in the store at odd times when a fill-in cashier was needed. Beginning November 22, 1999, Ms. Davis began full-time employment at Perdue Farms, Inc., and did not work in the grocery store again through its closing in October 2005. After November 22, 1999, Ms. Davis never made a deposit for the grocery store, never wrote a check for the grocery store, and had no knowledge of how the bank accounts were handled other than through Mr. Davis who managed the store's accounts. The court does not find that Ms. Davis acted in a fiduciary capacity

15

or committed a defalcation to support a claim under § 523(a)(4).

## CONCLUSION

Based on the foregoing, the court grants in part the motions for summary judgment of MEMO and the debtors and denies the motion for summary judgment of the trustee. Specifically, the court grants summary judgment in favor of MEMO on Count Three of the amended complaint. The trustee is directed to turn over the seized funds from the Money Order Account, pursuant to the Money Order Transmitters Act, in the amount of $39,507.30. The court grants summary judgment in favor of MEMO on Count Two of the amended complaint regarding Mr. Davis only. The court finds that Mr. Davis is personally liable for the remaining debt of $1598.08, pursuant to the Personal Indemnity and Guaranty and N.C. Gen. Stat. § 75-1.1. The court trebles that amount, pursuant to N.C. Gen. Stat. § 75-16, for a total of $4794.24. MEMO is entitled to reasonable attorneys' fees of $6,165.81, pursuant to the Agreement. The judgment of $4,794.24 in damages plus $6,165.81 in attorney's fees is excepted from Mr. Davis' discharge, pursuant to § 523(a)(4). The court grants summary judgment in favor of Ms. Davis on Count Two, as the undisputed evidence does not support a claim under § 523(a)(4) against Ms. Davis.

END OF DOCUMENT